Opinion by
Rice, P. J.,
The agreement out of which this case arose was executed on June 25, 1907, and begins as follows: “In consideration of Thirty $30 Dollars the receipt of which is hereby acknowledged and the agreements hereinafter mentioned William M. Hutton and Angeline Hutton his wife .... hereby grants unto Carnegie Natural Gas Company .... its heirs and assigns all the oil and gas in and under the following described premises, together *380 with, the right of ingress and egress at all times, for the purpose of drilling and operating for oil and gas and to conduct all operations and lay all pipes necessary for the production and transportation of same, reserving, however, to first parties the equal one-eighth part of all oil produced and saved from the premises, to be delivered in the pipe fines to the credit of first parties free of charge.” Here follows a description of the land, containing ten acres more or less. The agreement then proceeds: “To have and to hold the above premises unto the party of the second part its heirs and assigns, for and during the- term of ten years, or such part of said term as second party may consider it valuable for oil and gas purposes, and comply with the terms hereinafter mentioned, and as long thereafter as oil or gas is produced in paying quantities.” Then follows the clause upon the construction of which (as no oil was found) the case turns: “If gas only is found, second party agrees to pay at the rate of Three Hundred $300 Dollars each year, payable quarterly in advance, for the product of each well while the same is being used off the premises.” The agreement then provides that, if “no well is commenced on the premises within twelve months from this date, then this grant shall at once become null and void as to both parties, provided that second party may prevent such forfeiture from quarter to quarter and no longer, by paying to the first party in advance or within ten days thereafter at the rate of Three $3 Dollars per acre, annually, until such well is commenced.” The only other clause of the agreement that need be noticed is as follows: “It is further agreed that the second party shall, by paying all moneys due, have the right to surrender this grant at any time to the first parties and thereafter be fully discharged from any and all claims whatsoever arising from any neglect or non-fulfillment of the foregoing contract.”
It appears that within twelve months the defendant began drilling a well on the land, which, upon completion, it connected with its fine, and, on November 8, 1908, *381 began using gas off the premises. The installments due, for the three successive quarters, beginning November 8, 1908, were each paid in advance, as stipulated in the agreement. On August 2, 1909, which was just before the beginning of the fourth quarter, the well was disconnected and the plaintiffs notified to that effect, and, on November 27, 1909, the well was plugged, the casing removed therefrom, and the pipe fine from the well to the main line was removed. It is conceded that the defendant did not formally surrender, nor has it yet surrendered, the grant, but the well and line were never reconnected. The defendant’s evidence tended to show that the reason for the disconnection and abandonment of the well was that it was not producing gas in the fine.
This action was brought, in December, 1910, for the six quarterly installments beginning August 8, 1909, amounting in all to $450. By direction of the court, the jury rendered a verdict for the plaintiffs for the full amount of their claim, and from the judgment thereon this appeal was taken by the defendant.
The agreement between the parties was, neither in terms nor by the name they gave it, a lease of land for the purpose of exploring, drilling, and operating for oil and gas, but expressly and in apt terms was a grant of all the oil and gas in and under the described premises, to which was added the incidental right of ingress and egress for the purpose of drilling, operating, removing, etc. Oil and gas in and under land, being minerals, are part of the realty, which, notwithstanding their migratory nature, may be severed in title from the surface by conveyance so as to vest in the grantee the mineral estate, as fully as it was before vested in the owner of the land: Stoughton’s App., 88 Pa. 198; Blakley v. Marshall, 174 Pa. 425; Marshall v. Mellon, 179 Pa. 371; McIntosh v. Ropp, 233 Pa. 497, 512. In one of the latest cases on the subject it was said: “That there can be a severance of the minerals from the surface so as to create a separate estate in each, is too well settled to need the citation *382 of authorities. This rule is as old as the common law and is of universal application in this country. It adds value to property and makes it possible for the owner of the soil to sell and convey the underlying mineral estate, frequently for a large consideration, while he retains the surface for agricultural and other purposes. Such a beneficial rule of property should not be cut down or impaired by refinements and distinctions intended to defeat rather than widen its scope and purpose:” Hyde v. Rainey, 233 Pa. 540. Viewing the instrument under consideration in the light of these general principles, we are led to the conclusion that, as between the parties, it was in legal effect, and was actually intended to be, a conveyance of the oil and gas in and under the described land, whereby the title to them, the legal ownership of them, in place, was transferred from the grantor to the grantee. The language of the habendum does not militate against this conclusion, but rather strengthens it, because it provides that the grantee is to have and to hold the premises not only for the term of ten years, but as long thereafter as oil or gas is produced in paying quantities: Kingsley v. Coal & Iron Co., 144 Pa. 613-628. While the consideration presently payable was a small sum, it was not a nominal sum. Further, the grantee did not agree to drill any wells, nor to produce, or pay for though not produced,, any specified quantity of oil or gas. If the grantee had drilled no well, it could have been compelled to pay nothing •beyond the $30.00. True in that contingency, there would have been a forfeiture, unless the grantee paid $3.00 per acre annually, but it was optional with the grantee whether it would submit to a forfeiture of the grant or pay this sum to prevent it. As the grantee drilled a well within a year, and thus prevented a forfeiture, it is precisely accurate to say that whether it could be compelled to pay anything beyond the $30.00 paid at the execution of the agreement was dependent on the contingency thus expressed: “If gas only is found, second party agrees to pay at the rate of Three Hundred *383 $300 Dollars each year, payable quarterly in advance, for the product of each well while the same is being used off the premises.”
One view of this clause, as expressed in the defendant’s first and second points, is that, as the contract is in the nature of a grant of the gas in place, the relation of landlord and tenant did not exist; that, therefore, the defendant was not required to give actual notice to the plaintiff of abandonment in order to be relieved from liability; and that “the mere cessation of the use off the premises of the said gas by the defendant was sufficient to relieve it of anything for which the plaintiffs claim in this case.” Under this construction, though the well was producing gas in paying quantities, the defendant might relieve itself from liability by closing it, while still retaining the grant in full force and thus excluding the plaintiff. Of course, the defendant could reheve itself from future liability by surrendering the grant, for the agreement so provides, but in that case the plaintiffs would be restored to the beneficial enjoyment of the property; whereas, under the construction above suggested, they could be deprived of that as well as of the expected profits from a producing well, which it is fair to presume was part of the inducement for the grant. Viewing the instrument as a whole, we cannot bring our minds to the conclusion that this construction would carry out the intention of the parties, or is necessarily required by the words. Moreover, we are unable to reconcile it with the doctrine of Double v. Union Heat & Light Co., 172 Pa. 388; Wilson v. Philadelphia Company, 210 Pa. 484; and Shrader v. Phillips Gas & Oil Co., 44 Pa. Superior Ct. 55. It is urged that two of these cases are distinguishable from the present upon the ground that they relate to grants of incorporeal rights, and not to sales of gas in place. But this distinction can scarcely be made as to Double v. Union Heat & Light Co., however it may be as to the other two cases. There is not sufficient difference between the terms of the grant construed in that case and the terms of the *384 agreement under construction in the present case to warrant the conclusion that the latter was a sale of gas in place and the former was not. We conclude, therefore, that the points above referred to were properly refused.
The view of the clause taken by plaintiffs’ counsel, and ably set forth in the charge of the learned trial judge, is that, a well having been drilled and gas only having been found, the defendant became obligated to pay $300 a year until it surrendered the grant. It necessarily results, from this construction, that the undisputed facts— that at a certain date the well was plugged, the casing was removed therefrom, and the pipe line from the well to the main line was removed; that at a later date the main line which crossed the plaintiffs’ land was lifted; that these facts were known to the plaintiffs; and that the damages which they claimed to have sustained by the removal of the appliances and machinery of the defendant from the land were paid; in short, that the defendant ceased to produce gas from the well — are immaterial facts. As already intimated we agree that these facts, standing alone, would not constitute a complete defense. But it would also result, from the construction, contended for by the plaintiffs, that, although the disconnection and abandonment of the well were because of the fact, which the defendant’s evidence tended to show, that the well ceased to produce gas in the line, still the defendant must surrender the entire grant in order to escape liability annually for the stipulated sum of $300. We remark, in passing, that it is not necessary to adopt this construction in order to give full effect to the clause giving the defendant the right to surrender the grant. This can be done, and doubtless it was so intended, by construing that clause to mean that the defendant could surrender the grant even though the well was producing gas in the line. And, as suggested by appellant’s counsel, there are many other situations in which the grantee might desire to surrender the grant and be released from future liability. There is nothing in that clause that requires a different construe *385 tion. than they otherwise would have, of the words, “for the product of each well while the same is being used off the premises.” These words, taken in their natural and obvious meaning, show that the parties had in contemplation a well producing gas in sufficient quantities to be used off the premises, and intended that, though gas was found, yet, if the well subsequently failed so to produce, the obligation to pay for that well should terminate upon the happening of that event. When it is remembered that a substantial, though not a large, sum had been paid as purchase money at the execution of the conveyance, it becomes apparent that it was entirely reasonable for the parties, when they came to the subject of the additional sum to be paid as well royalties, to impose such limitation as the words we have quoted naturally imply. It is claimed, however, that this construction is not permissible under the cases last cited. It is to be noticed, however, that in Shrader v. Phillips Gas & Oil Co., it was not alleged that the well had become unproductive, and that in the Double case it does not clearly appear, from the report, that the well had failed. In the latter case, the defendant’s contention, as stated in the opinion of Mr. Justice Gkeen, was, “that the mere cessation of the use of the gas from the well terminated the lease of its own force and relieved the defendant from any further duty to the plaintiff.” Therefore we cannot say that the precise question now under consideration was necessarily involved in those cases. But in Wilson v. Philadelphia Company one of the defendant’s points was, that, if the jury found from the evidence that the defendant permanently ceased to use the wells as gas wells, on account of their failure to produce gas, then the plaintiffs were entitled to recover only the rent of those wells for the years up to and including the time when they were abandoned. The refusal of this point was assigned for error on appeal, and it was argued by appellant’s counsel that the royalties ceased when the gas ceased, citing, amongst other cases, Williams v. Guffy, 178 Pa. 342. *386 That there was evidence to warrant the submission of the point appears by the following excerpt from the opinion of Justice Dean: "The evidence in this case tending to show surrender of the lease or notice that it was abandoned scarcely amounted to a scintilla. It was strong, that the defendant because of unproductiveness had ceased to operate the wells, and as to one well had actually disconnected its pipes and drawn the casing; but it had not surrendered the lease nor had it given written or verbal notice of abandonment.” Notwithstanding this evidence it was held that the point was properly refused. It is thus seen that the case is like this in many particulars, including the particular arising upon the defendant’s evidence that the well had ceased to produce gas in the line. After reviewing and explaining some of the numerous decisions arising out of “these oil and gas contracts,” and particularly the Double case, Justice Dean said: "We again say that when the right of possession for operating purposes has been acquired, as here, by a successful search for the product, the lessee becomes answerable for the stipulated rental according to the terms of the agreement and is relieved of that liability only by showing payment, or notice to the lessor, either written or verbal, of abandonment. . . . And it is a wholesome rule tending to promote certainty in the determination of disputes in this class of contracts.” When this rule is considered in connection with the preceding part of the opinion, it is apparent, we think, that the court considered it applicable not only to agreements in the form of a lease, but to agreements in the form of that construed in the Double case and under consideration in this case. There being no good reason why it should not apply, we would not be warranted in refusing to follow it upon the ground that the agreement in the present case was not in terms, nor by the name the parties gave it, a lease. But the rule itself contains a qualification which must not be overlooked. It is inherent in the very nature of things, and is expressed.in the words, "the lessee becomes answerable *387 for the stipulated rental according to the terms of the agreement.” Necessarily, therefore, the stipulation as to the amount, and as to the time and circumstances during and under which payments are to be made, must be considered. • If, for example, they are to continue for a stipulated time only, the grantee’s obligation to continue them beyond that time does not arise from his omission to surrender the entire grant. So here, we cannot escape the conclusion that, by the very terms of the stipulation relative to the payment of the well royalties, a limitation was prescribed beyond which the obligation to pay for the product of that particular well would cease. Nor are we convinced that it was decided, or intended to be decided, in the Wilson case, that, notwithstanding such limitation, yet the grantee must go on paying for a nonproductive well or surrender the entire grant. The stipulation under consideration in that case was, as stated in the opinion of Mr. Justice Dean, "if gas was found in paying quantities the consideration in full was to be $500 per annum for the gas from each well when utilized.” This indicates the time when the payments were to begin, but does not as clearly and as certainly, as was done in the agreement under consideration, indicate when they are to end. In this particular as well as in the matter of consideration to which we have alluded the case is distinguishable from the case at bar, and we think the distinction is substantial. To hold that the defendant must surrender the entire grant or go on paying, notwithstanding the well, without its fault, has become nonproductive, would be to reform the contract, not to enforce the contract the parties made.
It results from the foregoing, that the question whether the well had become nonproductive should have been submitted to the jury with instructions that, if they did not find that to be the fact, the plaintiffs were entitled to recover the full amount of their claim; but, if they did find that to be the fact, then the defendant would not be liable for the quarterly installments beyond the year *388 (beginning November 8) within which it visibly and permanently abandoned the well. As to the liability of the defendant for the stipulated sum for the entire year which may have been entered upon before the well was abandoned, we refer to Nesbit v. Godfrey, 155 Pa. 251; Coulter v. Conemaugh Gas Co., 14 Pa. Superior Ct. 553. The first assignment of error is sustained, and the others are overruled.
Judgment reversed and venire facias de novo awarded.